1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5     UNITED STATES OF AMERICA

6          vs.                    CASE NO.: 2:15cr195-MHH

7     TAURUS RASHONE LASETER,

8          Defendant.

9          *  *  *  *  *  *  *  *  *  *  *  *  *  *

10                  SENTENCING

11         *  *  *  *  *  *  *  *  *  *  *  *  *  *

12         BEFORE THE HONORABLE MADELINE H. HAIKALA, UNITED

13   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday,

14   April 12, 2017, commencing at 11:00 a.m.

15

16                  APPEARANCES

17   FOR THE GOVERNMENT:      Mr. Curtis Ivy, Jr.
                             Assistant United States Attorney
18                           OFFICE OF THE UNITED STATES ATTORNEY
                             131 Clayton Street
19                           Montgomery, Alabama 36104

20   FOR THE DEFENDANT:      Mr. John Mark Shelnutt
                             Attorney at Law
21                           LAW OFFICE OF J. MARK SHELNUTT
                             Post Office Box 469
22                           Columbus, Georgia 31902

23         Proceedings reported stenographically;

24              transcript produced by computer

25

1    (The following proceedings were heard before the Honorable

2     Madeline H. Haikala, at Montgomery, Alabama, on Wednesday,

3     April 12, 2017, commencing at 11:00 a.m.)

4    (Call to Order of the Court)

5         THE COURT:  Good morning.  All right.  We are here this

6    morning in case 15-195.  This is United States of America versus

7    Taurus Rashone Laseter.  We are here for a sentencing

8    proceeding.

9         Is the United States ready to go forward?

10        MR. IVY:  Good morning, Your Honor.  Curtis Ivy on

11   behalf of the United States.  Also at counsel's table with me is

12   Mr. Doug Walters of the Drug Enforcement Administration.  And,

13   yes, we are ready to proceed.

14        THE COURT:  All right.  Is the defendant ready to go

15   forward?

16        MR. SHELNUTT:  Good morning, Your Honor.  Mark Shelnutt

17   for the defendant.  Yes, we are prepared to go forward.

18        THE COURT:  All right.  Very good.

19        Mr. Shelnutt, have you and Mr. Laseter had 35 days in

20   which to review the presentence report in this matter?

21        MR. SHELNUTT:  We have.  Yes, Your Honor.

22        THE COURT:  And I don't believe I've received any

23   objections to the report, have I?

24        MR. SHELNUTT:  No, Your Honor.  I filed a motion for a

25   downward variance.

1          THE COURT:  Yes.  I read that.

2          MR. SHELNUTT:  And I believe a sentencing memorandum.

3    There is one clarification I think we need to make.

4          THE COURT:  What is that, please?

5          MR. SHELNUTT:  Your Honor, just about the range of

6    punishment for -- I just want to make sure that on count one,

7    that the plea agreement anticipated that that plea was filed

8    with the defendant having one prior drug felony, which makes the

9    range of punishment for that crime 20 minimum -- a minimum of 20

10   to a maximum of life.  I just wanted to make sure that that was

11   clarified as opposed to the way the footnote reads, it looks

12   like that there were four that were anticipated.

13         THE COURT:  All right.  Mr. Ivy, do you want to address

14   that?

15         MR. IVY:  Sure, Your Honor.  So the record is clear, on

16   September 23rd of 2015, we did file a notice to establish the

17   prior convictions of the defendant.  At that time we were aware

18   of four prior convictions.  However, we only sought to enhance

19   him as to one.  Therefore, the minimum would be 20 years and the

20   maximum would be life.

21         THE COURT:  All right.  Thank you.

22         And does Mr. Laseter affirm or deny that he has been

23   previously convicted as alleged with respect to that prior?

24         MR. SHELNUTT:  He does not contest that, Your Honor.

25         THE COURT:  All right.

1          Mr. Laseter, do you understand that any challenge to

2   that prior conviction which is not made before imposition of

3   your sentence may not be raised to attack the sentence later on?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  All right.  Then with the understanding

6   concerning the prior, the Court accepts the presentence report

7   in this matter.

8          In compliance with Justice Breyer's majority opinion in

9   *United States v. Booker*, this Court, while not bound to apply

10  the guidelines, has consulted them and has taken them into

11  account on the issue of the appropriate range of sentence to be

12  imposed in this case.  In that regard, the Court notes that in

13  his plea agreement Mr. Laseter waived any right he may have for

14  a jury determination of the facts of this case in accordance

15  with *Booker*, and he admitted certain facts that bear upon the

16  computation of his offense level under the guidelines.

17         There being no objections to the presentence report,

18  and with the clarification previously made, the Court adopts the

19  factual statements contained in the presentence report and makes

20  specific findings that the defendant is a career offender in

21  accordance with Guideline 4B1.1.  That the guideline offense

22  level is 34.  The criminal history category is VI.  The term of

23  imprisonment for count one is 20 years to life.  The term of

24  imprisonment as to count three is five years to life.  The

25  supervised release period for count one is not less than ten

1   years and from two to five years as to count three.  The fine

2   range is from $17,500 to $20 million.  Restitution is not an

3   issue in this case.

4       Mr. Shelnutt, is there anything you would like to say

5   to the Court before the Court pronounces sentence?

6       MR. SHELNUTT:  Yes, Your Honor.  We did file a motion

7   for a downward variance.  And in support of that, we had filed a

8   sentencing memorandum, Your Honor, taking into account the

9   factors outlined in 18 USC 3553(a).

10      Your Honor, we've laid this out in some detail in the

11   memorandum.  But just taking in the fact of the nature and the

12   circumstances surrounding the crime, there was contact with this

13   defendant and a confidential source eventually.  The agreement

14   was made that they were needing to have a meeting to show some

15   money.  There had been some discussions on the phone about

16   purchasing ten kilograms and 100 of -- of cocaine and 100 of

17   marijuana.  But the actual talk that had culminated in the

18   meeting was to show money that would allegedly show that they

19   were capable of even doing such a thing.

20      When they arrived, Mr. Laseter was there with his

21   codefendant, Mr. Ivory.  A shoe box was handed by the

22   codefendant to the undercover confidential source.  Although it

23   was represented by the codefendant that there was 65 in there,

24   the actual total, I believe, was 55,000 -- approximately 55,800

25   some-odd dollars.  It was some few dollars short of the 55,000,

1    which was $13,000 short to have even purchased two kilograms.

2         So they basically showed up and had not enough money to

3    purchase -- to purchase two.  And we just ask that Your Honor

4    would take that into account in looking at the overall facts of

5    the situation.

6         Mr. Laseter was not the money man in the situation.  He

7    provided less than $10,000 of that money.  Mr. Ivory was the one

8    that was supplying the money.

9         And, Your Honor, we just submit that a closer look at

10   the defendant's criminal history shows that he's not ever been

11   involved in anything like this scale before.  Although it's

12   somewhat extensive, when you look at the first three felony

13   major -- you know, felonies that involved him, he was 17.  One

14   of them involved taking $20.  It was a robbery.  He was with

15   another person.  He got a split sentence of 22/5 on that.  And

16   in the other two cases he got sentenced in concurrent time to

17   five years.

18        In all the other three -- the three felony drug cases,

19   including the one that he was sentenced concurrent time in that

20   first one -- in all of his other drug cases, Your Honor, all of

21   them involved marijuana except for one, one of those early ones

22   when he was 18, that involved six rocks of cocaine.

23        So we're talking about, yes, they were felonies, and

24   I'm not trying to minimize them, but they were marijuana.  The

25   principal amount of them were when he was very, very young.  And

1    the case that involved cocaine was more than 11 years ago.

2        His last actual contact -- sentence involved having a

3    cell phone and a battery.  Yet, of course, he still falls under

4    the career offender because of the nature of his prior

5    convictions.  So he's standing here looking at 26 to 32 years,

6    Your Honor.

7        In his previous sentences, you'll see that the greatest

8    sentence that he ever really received to serve was five years,

9    and that was under state sentences that were with parole.  And

10   now he's looking at 26 to 32 years based on the career offender

11   and the amounts involved -- even though there was no actual, you

12   know, drugs seized.  There was no actual drugs that were seized

13   as a part of any of this, Your Honor.

14       So I just ask Your Honor to take into account those

15   facts that we have tried to put forth.  Mr. Laseter's 29 years

16   old now.  His mother's present.  He did not finish high school,

17   but he did get his GED.  His mother's in poor health as a home

18   health care worker.  He has lived with his step-father and his

19   mother prior to his arrest.

20       Your Honor, since he's been in, he's taken advantage of

21   opportunities in the system to try to better himself.  We

22   attached several of those to the sentencing memorandum so that

23   the Court can see that he has tried to avail himself of what's

24   been there.  I think he would be an excellent candidate for a

25   residential drug treatment, whatever is available in the system.

1    But, Your Honor, we just respectfully submit that

2  Mr. Laseter really has been -- and his history has relatively

3  been a small-time person.  Small-time player.  That's his

4  criminal history.  That's what it reflects.  He's not able to

5  finance something on a large scale.  That's obvious.

6    And we just ask that Your Honor would consider all of

7  these facts in assessing a sentence.  Not trying to minimize the

8  seriousness of what happened, but you're looking at someone who

9  we submit whose record, save a conviction involving six rocks of

10  cocaine, involved basically a marijuana -- some marijuana

11  convictions.  Not a significant quantity.  The highest sentence

12  he's ever got was five years.

13    Yes, he shouldn't have been in that parking lot that

14  night, but I submit that the evidence really shows the money

15  person was the codefendant.  We certainly submit -- I submit

16  respectfully that there's no real reason Mr. Laseter should be

17  given more time than what his codefendant received in the case.

18  Although -- I mean, I don't know that information and I don't

19  know everything about him.

20    But I want Your Honor to know that Mr. Laseter did sign

21  a cooperation agreement with the government as well, as I

22  mentioned in the sentencing memorandum.  And I don't know if it

23  would be appropriate to go into that, but I would say that my

24  understanding is he's met with agents, not just once but more

25  than once.  At least once when I was counsel.  He did have

1  previous counsel.  And I can tell you from my notes, from when I

2  was there, I believe Mr. Laseter was cooperative.  I believe he

3  told them everything he knew about every question he was asked.

4  I believe he gave information that appeared to be truthful and

5  could be useful.  Of course, I don't know that because I'm not

6  in a position to follow up, but I was there.

7          I've been doing this for 29 years, respectfully, Your

8  Honor.  And I understand I don't have any say so in the filing

9  of a 5K.  But I've never had a client go to the extent that I've

10 seen Mr. Laseter go to and not receive such a 5K from the

11 government.  So it's just put me in a bit of a different

12 situation than I otherwise would normally be.

13         And I would go into far more detail about the actual

14 cooperation if such a motion had been filed.  I do hope, having

15 addressed that, that Mr. Ivy might address that somewhat with

16 Your Honor as well.  I believe he has shown good faith and he's

17 shown an attempt to try to better himself.

18         And I would just respectfully ask, Your Honor, that --

19 the minimum sentences are so harsh here, that we would strongly

20 ask Your Honor to downward depart to at least the minimum.  I

21 mean, even under the minimum sentence, he's looking at -- if you

22 gave him 240 months, that's 20 years.  That's a lot of time.

23 And we're not talking about 20 years given in a state system.

24         And then we're talking also, of course, Your Honor,

25 about the five that would come consecutive.  So you're talking

1  about a person who's never served any significant time. And the

2  reason hasn't been because he hasn't been punished. I believe

3  his punishment has reflected what he had done.

4        But we submit that this -- the fact that he had -- the

5  number that he had has placed him in this category where this

6  monstrous sentence is really the only thing there that the Court

7  can really do. I would otherwise be asking respectfully for the

8  Court to consider going down significantly below that if we had

9  such an opportunity. But at this juncture, we don't. So we put

10  most all of this in the sentencing memorandum, Your Honor.

11        I very much appreciate the Court's time on behalf of

12  Mr. Laseter and just ask that you would take all of this into

13  consideration in passing sentence. Thank you.

14        THE COURT: Yes, sir, Mr. Shelnutt. I can tell that

15  you've thought through it a lot and appreciate everything that

16  you've said in your memorandum and everything that you've said

17  today.

18        Mr. Laseter, would you like to address the Court?

19        THE DEFENDANT: Yes, ma'am, I do.

20        I'll try to make it brief as I can be, Ms. Haikala.

21  Just try to convince you and show you, really, the character of

22  the man I really am; how I was raised up and grew up.

23        Like I know at a young age, you know, I lost my father.

24  Not an excuse, but I lost my father at seven years old. And my

25  mama, you know, not -- being young, not looking into the depths

1  of it, that she made sure that I ain't never want for nothing.

2  And I know her working two to three jobs as me growing up, you

3  know, making sure that I can be happy with anything I wanted.

4           You know, growing up, really being the type of

5  respectful, mannerful son that she raised me up to be and going

6  through life and having a type of, you know, image of being a

7  man of -- a leader and inspiration. Motivation. And that's

8  something I really, like, took a toll in growing up. And I

9  know -- not be looking in the depths of -- I was young, because

10 I didn't really want for too much. So I know my mama, she

11 really provided for a whole lot for me. So as growing up, I was

12 really like, you know, involved in a lot of stuff in school.

13 And just like grades and smarts of books, books sense, like I

14 always came home with all A's and -- you know, sometimes B's,

15 but, you know, I'd get fussed at if I come down with a low B or

16 anything or a high C.

17          So I know, you know, I'm not like no menace to no

18 society. I never did nothing really to just cause any kind of

19 problem. I look back at myself, consider myself a positive guy.

20          So I know as growing up, I was really deep involved in

21 sports throughout the surrounding cities and throughout cities.

22 Everybody knew about me throughout basketball and football.

23 Really good. And, you know, as me being who I was, I was really

24 kind of like the chosen guy to be able to just make it somewhat

25 in pros.

1       But as growing up and being 15 years old, like I said,

2  my mama, she worked three jobs at times.  Really just sometimes

3  couldn't make it to some games, but she was really making sure

4  that I could be happy and not want.  So at the age of 15, she

5  bought my first car.  You know, and around that time she started

6  taking upon a bad health condition.  And that's when she started

7  having blockage in her heart and she started having like -- she

8  had heart surgery.  And then right at that time there, that's

9  when my same life just went to turning, turning left.  Because I

10 really started getting involved in things that I -- that just

11 made me just go down a disaster, where I'm headed right now.  So

12 I really just took advantage of that.

13      Because before then, not just making an excuse, but my

14 mama, she really just stayed on me.  Like that was my mentor.

15 Like she really stayed on me, made sure, you know, I was just --

16 you know, homework.  I was just always on point of, you know,

17 doing my grades.

18      So when she started taking a toll of her health

19 problems and stuff like that, I really took advantage of that.

20 By her being in and out of the hospital, my stepdad being gone,

21 sometimes I got to man up and be the man of the house, make sure

22 everything clean, make sure everything okay.

23      So I really just took a toll and went with the wrong

24 crowd.  Even though the crowd always been around me, but I

25 always had the stronger mind to just avoid that and stay away

1 from that. But I always just -- you know, just -- you know, I

2 always did that.

3 But at this time, I guess, I don't know, I took

4 advantage of that. I took advantage of I had a car. Took

5 advantage that my mama going through bad health problems.

6 So around this time, after I got intervened inside, you

7 know, the street life or whatever, I took upon the image that I

8 always been a leader, motivator, and an inspiration. So that

9 took a part of me while I was in this -- other than me being

10 positive in the street life, too.

11 So me having this image, just, you know, doing positive

12 things in sports and stuff, being a leader there, telling people

13 what to do, what good to do, you know, it took a part of me

14 doing the same thing when I got involved in the street.

15 So from then there, it's like I took a part of the

16 image of the street, and it just went to having me just being

17 like another type of character, another type of character there,

18 to be able to just show people how good I could do illegally.

19 So I really started doing that by just dealing with a

20 little marijuana and, you know, bounce around, little crack

21 cocaine charge that I got caught up in. But, you know, I ain't

22 never did nothing too -- a major -- a major situation. I just

23 really just maintained. Something I just lied to my mama about.

24 Something I just kept away from my family, period.

25 A lot of things I did, but I continued to try to, you

1    know, stay positive.  Still tried to going to school.  But I let

2    this illegal life, this -- the streets and stuff overcome and

3    overwhelm me, and then that's when I caught my first drug

4    charge.

5         And I was at the wrong place at the wrong time with the

6    wrong people and caught a robbery charge.  It's something that's

7    really like an accessory to.  It's something that I didn't do.

8    Something was accessory to.  Something that money got took, but

9    I didn't take, but it really got me at the scene.  But, you

10   know, that I was there and really like that I did it.  You know.

11        Like me not knowing the law back then, really not

12   knowing too much that going on, my mama paid for a lawyer, but

13   really everything just really got railroaded.  So I got the

14   charge up on me, and I just -- you know, went with it and got my

15   biggest sentence from that, the 20 split 5 from there.

16        So as I went to prison and did my time, you know, I

17   thought in my mind frame, you know, that God just really trying

18   to show you that you had a life.  You had a career.  You could

19   have did things that you wanted to do, but, you know, it still

20   ain't over with.

21        And, you know, I really just tried to conduct myself in

22   a positive level as I go through prison.  I really like stayed a

23   spiritual guy, stayed in church for like a year daily, you know,

24   and -- but I still played both sides.  I still played both

25   sides.  But I really still tried to just try to make sure that I

1    know that -- you know, I was young when I went, 18, and I know I

2    will be 21 when I get out.

3         So, you know, I went still through prison to try to

4    maintain and got my GED while I was in -- that's where I got my

5    GED, while I was in prison.  I still tried to do the positive

6    thing.  Got drug treatment program.

7         I still tried to do the right thing, but I still never

8    just stayed on the right path and stayed right, because I always

9    managed to just subside and still play both sides.

10        But I know as a guy, anybody ever know me, they know

11   that, you know, I got a good character.  I got a good heart.

12   I'm respectful.  I'm mannerable.  I never been a type of

13   ruthless guy or no kind of menace.

14        So when I got out, you know, I still just told myself,

15   I'm just going to find a job.  I'm just going to find a job.

16   I'm just going to try to find a job and see can I just maintain

17   myself.

18        At this time, I was trying to do that and still dealing

19   with the wrong crowd while I was trying to do that.  I still let

20   that overwhelm me.  Being around them, with the things they do,

21   even though I know I'm trying to stay away from it, but I know

22   when you run with the wrong crowd -- you know, it's getting more

23   understanding now as I'm getting older.

24        Back then, you know, I seen it, I thought about it, I

25   talked about it, but I never just really just stayed away from

1  it, you know.  Because I know it don't matter what, if I'm still

2  around it, I'm intervening, if I'm still around it, I'm close

3  by, I know it going to always just overwhelm me.  So that's what

4  I let it do to me then.

5          And I ain't stay out probably about a good nine months.

6  I caught another marijuana charge.  Caught another marijuana

7  charge.  Got locked back up.

8          Around this time here, my mama going through another

9  bad health problem.  Something I never thought would go on.  She

10  had cancer of the lung and she had two hip replacements.  I

11  never thought I would see this woman here that I know that grew

12  up being strong, with three jobs, start walking with a walker.

13  It gave me another -- started walking with a walker to come and

14  see me.  Making it hard, stuff that going on.

15          I don't know nothing about how the chemo really could

16  have took her away from this world and how she used to tell me

17  when I got out, how she just really -- you know, she just really

18  be -- you know, take her vision away, just to come see me.  She

19  can't -- had to stop on the side of the road to come see me.

20  Just trying to make sure, you know, she could just always be

21  there for her son.

22          So this type of stuff here, I should have took so much

23  in consideration.  I talked about it.  I talked about it.  I

24  tried to act on it, but I still played both sides.  I still

25  never got my mind -- I still never got my mind made up.

1    So after I got out at this time here in 2013, I told
2 myself I was just going to really do it.  At the sentence right
3 there, at that time when I was in there, I told God to really
4 just give me a hard time.  And I came --

5    He did.  I went through trouble in there.  I got into
6 it with guys, you know, but I still tried to kept myself
7 positive.  I still tried to kept myself at a spiritual level.
8 But I got into it with guys.  A lot of stuff went on.  I was
9 about to come home.

10    That's when I got -- I got a cell phone charge while I
11 was in there, knowing I should never have been involved with
12 that.  I supposed to -- about to get out in another week and a
13 half to go home, but I'm dealing with a cell phone.  They gave
14 me another extra year for that.

15    And, you know, that's really hurt, too, because right
16 as my mama coming to get me, hard to come get me, I'm in the
17 back of the police car going to a Columbus, Georgia county jail,
18 you know, for a cell phone to get resentenced.

19    So a lot of that really hurt me.  That should have been
20 something to test me there.

21    But when I got out, I took me -- I told myself, I'm
22 going to get me a job.  The day I got out, my mama took me to a
23 tent where the church at outside in the grass, outside in the
24 yard, where the church at.  The preacher man came from -- I
25 can't remember what state.

1    But I'm there, and I felt like he was talking to me,

2 and I felt the spirit that I would just go do right.  So about a

3 good seven months, I'm searching, finding a job, trying to work.

4 Searching, finding a job, trying to work, trying to product

5 myself, trying to do right, but still being around that same

6 crowd.  Same people that I grew up with from elementary, they

7 doing the same thing.  Still be running the same crowd.  I still

8 let that overwhelm me again.

9    And when I started getting back and started dealing

10 back in the drugs again, I told myself -- I can't lie.  I told

11 myself, if I'm going to do it, then I might as well do it to my

12 best ability and try to get as much as I can.  But everybody

13 ever know me will tell you that, yeah, I was doing it.  I was

14 doing it back.  I'm not making excuse.  I was doing the wrong

15 thing.

16    But I was trying to make myself still stay productive

17 with the kids.  Because they know how I was in school.  Coaches

18 still talk about how I was in school, so I still make myself go

19 to practice, football practice and banquets, you know, doing the

20 things I can to help the kids.

21    People that need help or whatever, I try to do that.

22 Try to help the community.  City councilors.  I know I think I

23 had gotten him to write a letter to you.  He helped me to go

24 places, to do stuff to help kids out too.  You know, and I still

25 trying to keep a positive role.

1         So this situation right here, this situation -- this
2 situation right here, it just -- it got me grieved. Like I know
3 I wasn't on this level. I know I wasn't on this statute level
4 to be able to, you know, to have the money to get the five
5 kilos, really, even one kilo. Five kilos, really, not even one
6 kilo or 10 kilos.
7         But something came to me, word came to me, and I let
8 greed creep up in me, and I just grabbed it. And it's three
9 days that I knew -- three days, a person that I don't know,
10 don't know, really, where you from, nobody I don't know, really
11 just making my life disaster right there in three days.
12         I come and get in this -- get incarcerated for five
13 kilos or better, something I know I wasn't on the statute level
14 on, and I let greed catch me up. I let greed catch me up. It's
15 just making my life miserable right now. Making my life real
16 miserable right now.
17         And I'm just trying my best, Your Honor, to really just
18 get my life on the track. I know I did a lot. I know my past
19 say that I intervened in drugs, and I did. And I know I've been
20 going through a whole lot throughout my life.
21         And I just know now, the older I am right now, I feel
22 that, you know, that everything is just out of my system. Like
23 I'm really just tired. I don't want to just involve myself in
24 none of that.
25         I told myself if I could just get a presentable

1   sentence today, I'll go to prison.  Get as many trades as I can.

2   Get many trades as I can get.  The time come for me to come

3   home, I'll go to the halfway house, you know, and I could just

4   see could I be able to get me a great job from the trades I get,

5   and I could just maintain life.

6           I know life ain't getting no longer.  It getting

7   shorter, you know.  My folks, the woman I love, my mentor, she

8   been going through a lot of health problems.  She just been

9   going through surgery after surgery.  Just got her gallbladder

10  took out.  Just got fluid drained from her liver.  All this just

11  showing me a whole lot.  It's a lot of toll on me since I been

12  locked up these two years in the Montgomery City Jail.

13          I'm just really sorry for just -- for everybody that

14  ever tried to tell me what's right -- judges, principals,

15  coaches, you know, my loved ones -- always trying to tell me

16  what's right.  I really just want to go to them and let them

17  know I'm so sorry I disappointed them.

18          I know a lot of them shaking their head at me.  A lot

19  of them drop their head when they see me.  Because I know I had

20  another life.  And I was just so smart, an intelligent guy, I

21  could have took the easy way out and just do the things I love

22  to do and just go on through life, get education, play ball or

23  whatever.

24          Because God gifted me with a lot of ability.  He gifted

25  me with a lot of tools.  I got a lot of ability about myself,

1 | Your Honor.

2 |      And I just ask you please, please, don't let three

3 | days, of a guy that I don't really know -- I talked to on the

4 | phone.  He talked a whole lot of drugs.  Blowed it up real big

5 | and let this drug charge be real big for me, something I

6 | probably wouldn't be able to grab a half a kilo with, and just

7 | allowed me to be able to get a whole lot of time.

8 |      I know I got a background.  Like my lawyer said, like,

9 | I feel like it ain't enough to just give me 20 years, 25 years

10 | or better, you know.  So I just ask you, just, really, please,

11 | just be lenient as you can.  Please have a little grace, a

12 | little mercy on me.  And just -- I promise, I won't let you

13 | down.

14 |      I let plenty judges down that know me from my hometown,

15 | that know I played ball, you know, and talked to me about it and

16 | tell me to get my head together, and I let them down.  And I was

17 | telling them with a straight face, looking at them, telling them

18 | that I was going to do right.  And I still messed up.

19 |      So I just ask you to just, you know, let me be able to

20 | prove to you and show you that I can be able to maintain myself

21 | and go to prison and get plenty of trades as I can and make

22 | myself a better life.  I don't have no kids.  I never had a

23 | family.  I just ask you just to be able to just give me that

24 | ability, when I really just let me life go down to disaster for

25 | someone I don't know for three days.  A part of my life was

1    just -- just changed my whole future.  I ask you, please, just

2    give me an opportunity.  I'm sorry.

3           Thank you.

4           THE COURT:  Thank you, Mr. Laseter.

5           Mr. Ivy, is there anything you would like to say on

6    behalf of the United States?

7           MR. IVY:  Yes, Your Honor.  As Mr. Laseter was

8    pontificating regarding his version of events, it appeared that

9    he was arguing or advancing the theory that he was running with

10   the wrong crowd and, therefore, these events began to transpire.

11          But if the Court looks at paragraphs 9 and 10 of the

12   presentence investigation report, it's a little bit different.

13   Because Mr. Laseter is the one who called the informant that was

14   in Miami, Florida.  It wasn't the other way around, or it wasn't

15   someone else that influenced him to make that phone call.

16   Mr. Laseter made that particular phone call seeking the 10

17   kilograms of cocaine as well as 100 pounds of marijuana.

18          I also thought it was very interesting that when

19   Mr. Laseter was speaking, he spoke concerning five kilograms or

20   more when he was discussing the version of events.  In the

21   recording, clearly, to the informant, he's contacting the

22   informant regarding 10 kilograms.  So it appears he's trying to

23   minimize his involvement in what took place.

24          Nonetheless, the defendant did meet with members of the

25   Drug Enforcement Administration in an attempt to earn a downward

1  departure motion.  Such a motion was not filed.  It was not

2  filed in this case because the information that Mr. Laseter

3  provided did not advance any investigation by any investigating

4  authority, being state, federal, or local.

5       While not making a promise, he does have the

6  opportunity to earn a Rule 35 motion for downward departure.  To

7  this point he has not earned such, nor has he earned the 5K1.1,

8  but that possibility is still available.

9       And lastly, Your Honor, Mr. Laseter appears to be

10 arguing for this Court to basically give him a second chance to

11 prove that he's doing or going to do the right thing.

12 Mr. Laseter has had a number of second chances already.  Based

13 upon the presentence report, he has a number of prior

14 convictions which, in the end, made him a career offender.

15 Mr. Laseter has had these chances to change his life around and

16 chose not to take advantage of it.

17       That's all I have, Your Honor.

18       THE COURT:  All right.  Thank you.  Let me visit with

19 counsel for just a minute, please.

20    (Brief pause in the proceedings)

21       THE COURT:  All right.  I gave the statutory minimum

22 when I was describing the offense level and the criminal history

23 category.  The guideline range is 322 months to 387 months.

24 That's with the 60 months included.

25       So for count one, the guideline range, if I've done my

1    math correctly, is 262 months to 327 months, with the additional

2    60 months as to count three.

3           Pursuant to this Court's authority under *Booker* to

4    impose a sentence outside the guideline range, it is the

5    judgment of the Court that it is appropriate in this

6    circumstance to vary downward slightly.  Therefore, the Court

7    determines that the defendant, Taurus Rashone Laseter, shall be

8    committed to the custody of the Bureau of Prisons to be

9    imprisoned for a term of 240 months as to count one and 60

10   months as to count three.  The sentence imposed in count three

11   shall run consecutive to the sentence imposed in count one.

12           Having considered the guideline computations and having

13   taken them under advisement, the Court finds that the sentence

14   imposed is sufficient but not greater than necessary to comply

15   with the statutory purposes of sentencing.  Furthermore, the

16   Court believes that the sentence is reasonable when considering

17   the sentencing factors found at 18 United States Code, Section

18   3553(a).

19           The Court has considered the nature and circumstances

20   of the offense and the history and characteristics of

21   Mr. Laseter.  The drug offense in this case is a serious one,

22   and the guideline computations were increased because there were

23   guns involved.  The police found guns at the time of the arrest,

24   and that's a significant issue in the Court's view.  And it

25   rightfully increases the guideline computation.

1  The Court also has considered Mr. Laseter's criminal

2  history.

3  And, Mr. Laseter, you are right.  From all the Court

4  can tell, you are somebody who walks both sides of the fence.  I

5  read the letters that were submitted in support of you, and they

6  depict a young man who has a lot to give and is willing to

7  contribute to his community and to try to help young men learn

8  how to be good athletes and encourage them.  And that's all

9  extremely good work.

10  And at the same time, you're hanging out with people

11  who are only going to get you in trouble.  And you are part of

12  that trouble.

13  And while in some of your criminal history you've

14  stolen only $20, when you steal the $20, there's a gun involved,

15  and the victim of that robbery is hit over the head repeatedly

16  with the gun.  The Court can't minimize that.  That is serious.

17  And I hope you really have come to realize that there

18  are big and significant consequences to your behavior.  And if

19  you don't, after this sentence, change, the consequences are

20  just going to keep piling up.

21  You have, I think, in a really lovely way let your mom

22  know today how much you appreciate her.

23  Ms. Rogers, I know you have given a tremendous amount

24  to your son, and so he has a lot of material to work with.

25  I don't know you, Mr. Laseter, the way the other judges

1  who may have visited with you seem to know you because of their

2  familiarity with the community and with you.  But you do seem

3  like a smart person who has a lot to give if you just channel

4  all of the talent that you have and all of the good lessons that

5  your mom tried to give you in the right direction.

6        While you're in prison this time around, you need to

7  stay out of trouble.  You know better than any of us in here

8  that there are lots of bad influences in jail and in prison, but

9  there are lots of people who steer clear of that and make their

10  way and do what they have to do.

11        And I hope you will take advantage of all the training

12  that may be available to you so that when you get out, you

13  really can do what you told me you wanted to do, and that's find

14  a job and get busy about living a good life.  I really hope that

15  for you.  It's going to take, though, a commitment to giving up

16  all the things that have gotten you off track over and over

17  again so far.  The Court has taken into account the fact that

18  much of your criminal history is from when you were a relatively

19  young man, and hopefully age and maturity will help you overcome

20  the bad decisions that you've made in the past.

21        The Court believes that the sentence imposed reflects

22  the seriousness of the offense, promotes respect for the law,

23  and provides just punishment for the offense.  The sentence also

24  affords adequate deterrence to criminal conduct and protects the

25  public from further crimes of Mr. Laseter.  The sentence will

1   further provide Mr. Laseter with needed vocational training and

2   any other opportunities that are available for drug treatment

3   and other services while Mr. Laseter is in prison.  Finally, the

4   sentence avoids unwarranted sentence disparities among

5   defendants.

6           The Court orders criminal forfeiture, and a separate

7   order of forfeiture will be issued in this case.

8           In addition, while the Court is not imposing a fine,

9   the Court is imposing a special assessment fee of $200, and that

10  special assessment fee is due immediately.

11          Upon release from prison, Mr. Laseter shall be placed

12  on supervised release for a term of ten years as to count one

13  and a term of five years as to count three, with those terms of

14  supervised release to run concurrently.

15          While on supervised release, Mr. Laseter shall comply

16  with the standard conditions of supervised release of record of

17  this court, and the following special conditions:

18          Mr. Laseter must participate in a program approved by

19  the U.S. Probation Office for substance abuse, which may include

20  testing to determine whether he has reverted to the use of

21  drugs.  Mr. Laseter will have to contribute to the cost of

22  treatment based upon his ability to pay and the availability of

23  third-party payments.

24          In addition, Mr. Laseter must submit to a search of his

25  person, residence, office, or vehicle consistent with the search

1   policy of the court.

2           Is there a motion from the United States?

3           MR. IVY:  Yes, Your Honor.  At this time, as the

4   defendant has been sentenced on counts one and three, we would

5   move to dismiss the remaining count, being count two, as to this

6   defendant.

7           THE COURT:  All right.  The Court grants that motion.

8           Is there any objection from any party as to the

9   findings of fact, the calculations, the sentence, or the manner

10  in which the sentence was pronounced or imposed?

11          MR. IVY:  None from the government, Your Honor.

12          MR. SHELNUTT:  None, Your Honor.

13          THE COURT:  All right.  I am going to make the

14  recommendation for RDAP, Mr. Shelnutt.  Is there any

15  recommendation you would like the Court to make with respect to

16  placement?

17          MR. SHELNUTT:  As close to home as possible, Your

18  Honor, of course, if the Court would consider.

19          THE COURT:  All right.

20          MR. SHELNUTT:  Thank you.

21          THE COURT:  Is there anything else for the United

22  States today?

23          MR. IVY:  Just for clarification, Your Honor, as the

24  Court was pronouncing sentence, it did mention forfeiture.  So

25  it's going to make the preliminary order of forfeiture final as

1   part of this record?

2           THE COURT:  Yes, sir.

3           MR. IVY:  That's all I have, Your Honor.

4           THE COURT:  Anything else for the defendant?

5           MR. SHELNUTT:  No, Your Honor.  Thank you.

6           THE COURT:  All right.

7           Anthony, anything else?

8           The Court grants document 78.  The Court has also

9   granted document 109.

10          All right.  Thank you for your time today.

11          MR. IVY:  Thank you, Your Honor.

12          MR. SHELNUTT:  Thank you, Your Honor.

13      (Proceedings concluded at 11:49 p.m.)

14                  *  *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the record of the proceedings in the above-entitled matter.

4                          This 3rd day of July, 2018.

5

6                          /s/ Patricia G. Starkie
                           Registered Diplomate Reporter
7                          Certified Realtime Reporter
                           Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25